UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MADELINE MADERA,

                          Plaintiff,

                                                    **MEMORANDUM AND ORDER**
      - against -                                        17-CV-7555 (RRM)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
-----------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

        Plaintiff Madeline Madera brings this action against the Commissioner of the Social

Security Administration ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3),

seeking review of the Commissioner's determination that she is not entitled to disability

insurance benefits ("DIB") under Title II of the Social Security Act ("SSA").  Madera and the

Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  (Def.'s Mot. (Doc. No. 16); Pl.'s Mot. (Doc. No. 12).)  For the

reasons set forth below, the Commissioner's motion is denied, Madera's motion is granted, and

the matter is remanded to the Commissioner for further proceedings consistent with this

Memorandum and Order.

                                    **BACKGROUND**

Madera's Pre-Application History

        Madera was born on December 5, 1974.  (Tr. 148.)[1]  She obtained a bachelor's degree in

business administration in May 2012.  (Tr. 45, 197.)  From approximately 1997 through 2014,

she worked as an executive and team assistant/administrator for UBS in Stamford, Connecticut.

---
[1] Numbers in parentheses preceded by "Tr." denote pages in the administrative transcript.

(Tr. 185.)  This work consisted of providing executive and administrative support to senior managers by answering telephones; meeting, greeting, and escorting guests; managing executive calendars; scheduling meetings; booking travel; processing expenses; ordering supplies; processing invoices; handling incoming and outgoing mail; and scanning and filing records.  (Tr. 209.)

In 2006, Madera began to experience psychiatric symptoms and began visiting a psychiatrist, Isak Isakov, M.D.  (Tr. 501.)  He diagnosed her with generalized anxiety disorder and posttraumatic stress disorder ("PTSD").  (Tr. 501.)  The administrative transcript contains progress notes indicating that plaintiff treated with Dr. Isakov at least once a month throughout 2014, (Tr. 482–501), and on two dates in October 2015, (Tr. 557–58), but the transcript does not contain records for any other years.

Marina Neystat, M.D.

On July 14, 2010, Madera began treating with neurologist and psychiatrist Marina Neystat, M.D.  (Tr. 286.)  According to Dr. Neystat's notes of Madera's initial visit, Madera complained that she had been experiencing burning pain in her legs for 4 years and described her current pain as level 8 out of 10.  (Tr. 286.)  She also complained of neck and lower back pain, which she described as level 7 out of 10; headaches; depression: and chronic fatigue.  (*Id.*)  Madera stated that heat helped with her back pain; medications did not.  (*Id.*)

Upon examination, Dr. Neystat noted that Madera complained of chest pain and palpitations, as well as swelling in her hands, tiredness, sleep problems, tingling in her hands, ringing in her ear, dizziness, weakness, balance problems, and back pain.  (Tr. 286–87.)  Madera's mental status was assessed as normal.  (Tr. 287.)  However, Dr. Neystat noted an abnormality in her Achilles reflex bilaterally.  (Tr. 288.)  The doctor's examination of Madera's

back revealed paraspinal tenderness and muscle spasm, and Madera had a reduced range of motion in her neck: decreased flexion, extension, rotation, and lateral flexion. (*Id.*) Madera's lumbosacral spine also showed decreased range of motion in flexion, extension, left tilt, and right tilt. (*Id.*) Dr. Neystat's impression was that Madera had fibromyalgia and either lumbar radiculopathy or polyneuropathy. (*Id.*) Dr. Neystat performed an EMG and nerve conduction tests and ordered an MRI of the spine. (*Id.*) The doctor prescribed Lyrica, a medication used to treat pain in people with fibromyalgia. (Tr. 289.)

On July 28, 2010, Madera saw a physical therapist, Alex Romanov, who noted that Madera presented with complaints of severe pain in her lower back, aggravated by bending, lifting, sitting, and standing. (Tr. 290.) He noted that Madera had a decreased range of motion in her trunk, as well as decreased muscle strength and decreased function. (Tr. 292.)

On August 18, 2010, Madera had a follow-up visit with Dr. Neystat. (Tr. 293.) The doctor noted that the Lyrica had reduced Madera's pain from an 8 of 10 to a 4 of 10. (*Id.*) Although the doctor's physical findings were largely unchanged, the EMG and nerve conduction studies were normal, and the MRI was unremarkable, the doctor's impression was that Madera had cervical myofascial pain syndrome, as well as fibromyalgia. (Tr 294–95.)

At her December 22, 2010, follow-up with Dr. Neystat, Madera's pain level was 5 of 10. (Tr. 297.) However, she complained of experiencing vertigo and imbalance daily since October. (Tr. 297.) The doctor's impression was this dizziness could be caused either by vestibulopathy – *i.e.*, an inner ear problem – or a posterior fossa lesion – a brain tumor. (Tr. 299.) She ordered an MRI of the brain to rule out the latter possibility. (*Id.*)

Madera had not undergone the MRI by the time of her next visit on April 12, 2011. (Tr. 301.) However, her vertigo and imbalance had not improved; she reported feeling dizzy several

times a day. (*Id.*) The dizziness was accompanied by headaches which occurred two or three times a week. (*Id.*) Dr. Neystat's impression was that she was suffering from migraine headaches, and the doctor prescribed nortriptyline – an antidepressant that can be used to treat chronic headaches. (Tr. 303.)

Madera had MRIs of her brain and spinal canal sometime prior to her next visit on May 18, 2011. They were unremarkable. (Tr. 308.) Her symptoms were largely unchanged; her neck and lower back pain was still 5 out of 10, and the dizziness and headaches persisted. (Tr. 305.) The doctor continued Madera on nortriptyline, but increased the dosage of Lyrica from 75 mg to 100 mg. (Tr. 307.)

When Madera visited physical therapy on July 20, 2011, her back pain was severe, estimated at 8-9 out of 10. (Tr. 309.) The range of motion in her trunk had not improved. (*Id.*) Madera continued to complain of severe pain during her three July 2011 visits to Romanov, (Tr. 312–15), but described the pain as "fluctuating" during her five visits in August 2011. (Tr. 316–19.)

Madera's condition had not improved by the time of her next visit to Dr. Neystat on November 22, 2011. (Tr. 321.) The doctor ordered a battery of tests. (Tr. 327.) Although the doctor's notes do not reflect the change in her prescriptions, the notes of Madera's December 28, 2011, visit indicate that the doctor had substituted Savella – another drug used to treat fibromyalgia – for the Lyrica. (Tr. 329.)

On December 28, 2011, Madera reported that her headaches had improved, and now occurred only once a week. (Tr. 329.) However, she reported difficulties sleeping and feeling fatigued during the day. (Tr. 337.)

At her July 31, 2012, visit to Dr. Neystat, Madera's principal complaint was fatigue. (Tr. 333.) She reported that her neck and back pain and her headaches had improved with medication. (Tr. 329.) The doctor's impression was that she had "chronic fatigue." (Tr. 335.) Thereafter, Madera began to see another neurologist at Dr. Neystat's practice – Maria Dolgovina, M.D. – who specialized in sleep medicine.

On August 6, 2012, when Madera first saw Dr. Dolgovina, Madera reported daily headaches, with a pain level of 6 out of 10, and a menstrual migraine. (Tr. 337.) Her neck and back pain remained the same: 5 out of 10. (*Id.*) So did her sleep problems. Although she estimated that she was getting seven hours of sleep a night, she felt fatigued during the day and had difficulty concentrating and performing her job. (Tr. 337.) Dr. Dolgovina posited that she might have "sleep disordered breathing," and sought rule out obstructive sleep apnea by ordering a nocturnal polysomnography ("NPSG" or "Sleep Study"). (Tr. 340.)

Dr. Dolgovina's notes of Madera's October 19, 2012, visit indicate that the results of the NPSG were consistent with upper airway resistance syndrome ("UARS") – a condition similar to sleep apnea. (Tr. 360.) Madera had been given a CPAP machine and reported a significant improvement in her sleep, fatigue, and migraines. (*Id.*) However, she was still experiencing headaches once a week, with pain levels estimated at 5 out of 10, which were accompanied by nausea and dizziness. (*Id.*) Her condition was unchanged by the time of her November 21, 2012, visit to Dr. Neystat. (Tr. 364–67.) Madera's condition was also much the same when she saw Dr. Dolgovina on January 10, 2013, except that she had fractured her right foot in a fall and had been unable to use her CPAP due to a viral illness. (Tr. 368.)

Madera did not see either of the neurologists again until January 10, 2014, by which time her condition had greatly deteriorated. She complained of increased fatigue, despite the use of

her CPAP; episodes of sleep paralysis; and generalized weakness. (Tr. 372.) Her neck and back pain had increased to 7 out of 10, and she was experiencing almost daily headaches with severity levels estimated at 6 out of 10. (*Id.*) In addition, she was complaining of pain in her hands, estimated at level 8 out of 10 on the right, and accompanied by numbness and tingling. (*Id.*) Dr. Dolgovina noted that Madera had a history of carpal tunnel syndrome bilaterally but was uncertain whether the hand pain was due to that or cervical radiculopathy. (Tr. 375.) She also posited that Madera might have narcolepsy, not just sleep apnea, and prescribed a Multiple Sleep Latency Test ("MSLT"). (*Id.*) The doctor increased the dosage of Savella from 50 to 75 mg., and gave Madera an intravenous infusion of magnesium, which is used to treat headaches. (*Id.*)

Notwithstanding this increase in medication, Madera's condition was not much improved when she next saw Dr. Dolgovina a month later. (Tr. 376.) Although Madera claimed that her neck and back pain was "slightly improved," she still rated it 7 out of 10. (*Id.*) Similarly, although she claimed her headaches had improved, she continued to rate them 6 out of 10 and said they had increased in frequency. (*Id.*) The doctor's impression was that she had cervical radiculopathy, UARS, and chronic daily headaches. (Tr. 379.) Since Madera had yet to have the MSLT, the doctor still had not eliminated the possibility that she had narcolepsy. (*Id.*) Dr. Dolgovina administered another infusion of magnesium. (*Id.*)

Madera had a second NPSG on February 15, 2014, and the MSLT on February 16, 2014. (Tr. 381, 384–85.) During the former study, Madera exhibited periodic limb movements of moderate frequency, which suggested she might have Periodic Limb Movement Disorder. (Tr. 385.) The findings of the latter study were inconsistent with narcolepsy. (Tr. 381.)

By March 17, 2014, Madera's neck and back pain was slightly improved, from 7 to 6 out of 10. (Tr. 391.) All other symptoms are essentially the same. (*Id.*) Although her insomnia had

improved after she began taking Xanax, a drug used to treat anxiety and panic disorders, Madera continued to complain of fatigue and sleepiness during the day. (*Id.*) The doctor prescribed Amitriptyline – another drug used to treat anxiety. (Tr. 394.) Dr. Dolgovina also gave her an infusion of both magnesium and vitamin B complex in an attempt to control the headaches. (Tr. 395–96.)

When she followed up with Dr. Dolgovina on April 18, 2014, Madera reported that she could not tolerate Amitriptyline. (Tr. 397.) Her condition was unchanged, and the doctor gave her another infusion of magnesium and vitamin B complex. (Tr. 400–02.) The doctor also prescribed Viibryd, another antidepressant, to replace the Amitriptyline. (Tr. 400.)

By June 5, 2014, Madera's condition had improved somewhat. Her neck and back pain was reduced, and she rated the severity of her headaches and hand pain as 5 out of 10. (Tr. 403.) In addition, her anxiety and insomnia had improved, and her generalized weakness and fatigue was somewhat diminished. (*Id.*) The doctor attributed the improvements in her anxiety to the Viibryd, and a reduction in her weakness and fatigue to the Savella and vitamin B complex. (*Id.*) The doctor administered yet another infusion of magnesium and vitamin B complex. (Tr. 406–08.)

Madera's condition was unchanged at the next three visits, which took place on July 11, August 1, and September 4, 2014. (Tr. 411, 417, 423.) At all three visits, the doctor again administered an infusion of magnesium and vitamin B complex. (Tr. 414–16, 420–22, 426–28.) At the latter visit, she also administered an injection of vitamin B-12 to rectify a vitamin deficiency. (Tr. 426, 429.) Madera received a second shot of vitamin B12 on September 11, 2014. (Tr. 434.)

<u>Jill Silverman, M.D.</u>

During much of the time that Madera was visiting the neurologists, she was also treating with a rheumatologist: Jill Silverman, M.D. When first evaluated by Dr. Silverman in February 2011, Dr. Silverman noted that Madera was positive for fibromyalgia with classic positive trigger points. (Tr. 357.) Dr. Silverman noted that Madera had pain in muscles and joints and thought she might have Raynaud's syndrome – a condition in which some areas of the body feel numb in certain circumstances. (*Id.*)

Dr. Silverman's observations were similar to those reported in Dr. Neystat's records. On March 3, 2011, Madera complained of severe neck pain and dizziness while standing. (Tr. 356.) She described having a dizzy spell the previous day in which she perceived the room to be spinning – an episode which Dr. Silverman described as a possible pre-syncopal event. (Tr. 355.) On June 16, 2011, Dr. Silverman noted that Madera was experiencing more migraine headaches, severe upper back pain, and muscle twitching. (Tr. 353.) On August 11, 2011, Dr. Silverman noted that Madera presented with "excruciating" muscle pain, so bad that she had trouble washing her hair. (Tr. 351.) Madera also complained of dizziness, and the doctor noted that she had twitching muscles. (*Id.*) Dr. Silverman assessed Madera as suffering from severe fibromyalgia and possibly PTSD. (Tr. 352.)

On November 11, 2011, Dr. Silverman noted some muscle twitching, but Madera reported feeling less pain and more energy. (Tr. 348.) However, Madera complained that at times she felt she was "in a fog." (*Id.*) Dr. Silverman opined that her fibromyalgia was improving. (Tr. 349.)

Dr. Silverman did not see Madera again until October 19, 2012 – almost a year later. Dr. Silverman noted that her neurologist had changed her medication from Lyrica to Savella, which

caused her condition to improve. (Tr. 346.) The neurologist had also referred her to a sleep clinic, and Madera had been prescribed a CPAP machine, which helped her to sleep better. (*Id.*) Nonetheless, Madera – who Silverman described as "tearful" – reported missing work and told the doctor she wanted to see a therapist. (*Id.*) Dr. Silverman assessed Madera as having "severe fibromyalgia." (Tr. 347.)

When Madera next visited Dr. Silverman on August 7, 2013, she reported increased flare-ups of fibromyalgia and severe pain despite her use of Flexeril and Savella, orthotics, and a TENS unit. (Tr. 344.) Madera reported that the pain had been so severe that she had been forced to leave work and rest all day on the Monday prior to the visit. (*Id.*) Dr. Silverman again assessed Madera as having "severe fibromyalgia." (Tr. 345.)

On July 25, 2014, Madera reported flareups of fibromyalgia caused by stress at work. (Tr. 342.) She reported that she had resigned effective January 21, 2014. (*Id.*) On examination, Dr. Silverman noted that Madera's symptoms persisted, including pain, fatigue, muscle weakness, and migraines. (*Id.*) The doctor's assessment was that Madera was suffering from chronic pain syndrome with a sleep disorder. (Tr. 343.)

Marissa Santos, M.D.

Although the administrative transcript contains a letter from Marissa Santos, M.D., which states that Madera had been under her care since 2012, there are only a two progress notes from this board-certified internist and Madera's primary care physician. The first pertains to a visit on July 22, 2014, when Madera presented complaining of an exacerbation of her fibromyalgia, migraines, sleep apnea, and muscle weakness. (Tr. 508.) One of the tests for Lyme disease had proved positive, but others had come back negative. (Tr. 509–10.) In addition, Madera had other abnormalities in her lab results such as elevated bilirubin, elevated $CO_2$, and borderline

Epstein-Barr test. (Tr. 508–09.) The second progress notes pertain to an August 5, 2014, visit, when Madera presented complaining of non-exertional chest pains. (Tr. 506.) The administrative transcript contains only one page of the notes generated during this visit, so it is unclear what Dr. Santos did in response to Madera's complaint, or whether she assessed the causes of those pains.

In addition to the progress notes, the administrative transcript contains a five-sentence letter from Dr. Santos dated August 12, 2014. After noting that Madera had been treating with Dr. Santos since 2012, the letter states that Madera suffers from chronic fatigue and generalized muscle weakness caused by fibromyalgia. It states that Madera was "recently diagnosed" with Lyme disease, and recently complained of non-exertional chest pain. (Tr. 358.) The letter notes that Madera had yet to see a cardiologist, but had seen a psychiatrist, a neurologist, and a therapist. (*Id.*) Dr. Santos opined that Madera needed "to take time off from work to address her medical issues." (*Id.*)

Madera's Application for DIB and Post-Application Medical History

On or about July 29, 2014, Madera filed a claim for DIB, alleging an onset date of July 21, 2014. (Tr. 148, 196.) She alleged that she was disabled because of a combination of impairments: fibromyalgia, chronic fatigue, migraine headaches, sleep apnea, restless leg/limb movement disorder, PTSD, anxiety, and depression. (Tr. 196.)

Madera had several medical appointments in the three months after she filed her application for DIB. Most of these were with Dr. Dolgovina and her physical therapist, Romanov. But one was with Dr. Thomas Schiano, an attending physician at Mt. Sinai who specializes in liver problems.

On August 1, 2014, Madera visited Dr. Dolgovina, complaining of difficulty falling asleep, neck pain, headaches, hand pain, generalized weakness and anxiety.  (Tr. 417.)  Dr. Dolgovina noted that Madera's headaches had improved with intravenous injections but occurred weekly with associated dizziness and nausea and remained at level 5 of 10.  (*Id.*)  Madera reported pain and numbness in her hands at level 5 of 10.  (*Id.*)  Madera noted increased fatigue which improved with use of a CPAP machine.  (*Id.*)  Madera's physical examination revealed a number of abnormalities, including a positive Tinel's sign on the right, an unstable gain and positive Fukuda test on the right, decreased sensation below the knees and in the right forearm, brachioradialis of 1/4 on the right, and Achilles reflex of 1/4 bilaterally.  (Tr. 419.)[2]  There was tenderness and muscle spasm in the cervical and lumbar spine as well as decreased range of motion.  (Tr. 419–20.)  Dr. Dolgovina continued Madera on Viibryd, increased her dosage of Savella, and gave her another infusion of magnesium and vitamin B complex.  (Tr. 420.)  Dr. Dolgovina diagnosed cervical radiculopathy, upper airway resistance syndrome, migraine headaches improved, fibromyalgia, anxiety, and insomnia.  (Tr. 420.)

Madera had a consultation with Dr. Schiano on August 8, 2014.  His notes indicate that Madera was being treated for "chronic Lyme and fibromyalgia," but that her chief complaints were arthralgias, elevated liver function tests, and Gilbert's syndrome.[3]  (Tr. 512–14.)  He noted that Madera was positive for fatigue and possibly suffering from Raynaud's syndrome.  (*Id.*)  He ordered lab tests and imaging and considered a liver biopsy.  (Tr. 514.)  The lab tests showed

---

[2] The Fukuda test is used to assess vestibular or balancing problems.  Tinel's sign – a "pins and needles" sensation in response to percussing a nerve – indicates nerve irritation.
[3] Arthalgia is joint pain.  Gilbert's (or zheel-BAYRS) syndrome is a common, harmless liver condition in which the liver does not properly process bilirubin.  Bilirubin is produced by the breakdown of red blood cells.

elevated sedimentation rates and abnormal liver function and were positive for Lyme disease. (Tr. 515–23.) [4]

Dr. Dolgovina saw Madera again on September 4, 2014. Madera presented with similar complaints, and the doctor made findings similar to those she had made a month earlier. (Tr. 423–26.) Dr. Dolgovina assessed cervical radiculopathy, UARS, migraine headaches improved, fibromyalgia, anxiety, and insomnia, as well as a vitamin B-12 deficiency. (Tr. 420.)

On September 10, 2014, Madera presented for physical therapy and complained of headaches and neck pain with a level of 8–9 out of 10. (Tr. 430.) She reported difficulty with daily activities, including putting on socks, bathing, brushing her teeth, bending to lift over 5 pounds, carrying over 10 pounds, walking or standing over 30 minutes, and sitting more than 30–45 minutes. (Tr. 430.) On examination, Madera appeared anxious and had limited strength and range of motion in the cervical spine. (*Id.*)

Dr. Dolgovina saw Madera on October 10, 2014. The doctor noted decreased sensation below the knee; an unstable gait with a positive Fukuda test; tenderness and muscle spasm with decreased range of motion in the cervical and lumbar spine; and a positive Tinel's sign on the right. (Tr. 599–600.) She noted that Madera's headaches were improved. (*Id.*)

The Consultative Examinations

It is unclear whether the state examiner sent any questionnaires to Madera's treating physicians. However, it is clear that the examiner asked Madera to submit to a pair of consultative examinations. (Tr. 92.) Those examinations took place on October 15, 2014.

At the first consultative examination, Madera was examined by psychologist Johari Massey. Dr. Massey's report of the examination notes that Madera claimed that she had stopped

_____

[4] Elevated sedimentation is a lab result indicative of fibromyalgia or Lyme disease.

working in July 2014 because she was "unable to work … due to pain, fatigue and 'other symptoms' that 'intensified' significantly along with the frequency of pain flares." (Tr. 469.) Dr. Massey notes also that Madera stated that she had never been hospitalized for psychiatric reasons but had seen a psychiatrist and therapist in the past for a period of approximately two years and had returned to therapy with a psychiatrist and psychologist since January 2014. (*Id.*)

Massey's report states that Madera claimed to have fibromyalgia, chronic fatigue syndrome, migraine headaches, sleep apnea, seasonal allergies, reactive hypoglycemia, and teeth grinding. (Tr. 469–70.) Madera also claimed that she experienced crying spells, irritability, fatigue, and social withdrawal; that she suffered from anxiety and panic attacks which caused heart palpitations, sweating, breathing difficulty, and trembling; that stressful situations tended to cause panic attacks and/or confusion; that she was overwhelmed easily when in pain or fatigued; that during fatigue episodes she could get more anxious; that when she experienced pain flares she could feel more confused; that when stressed she needed to set aside tasks and complete them later; and that she needed to put everything on a calendar to remind herself. (Tr. 470–71.)

On examination, Dr. Massey observed that Madera had normal posture and motor behavior, and that her eye contact was appropriate. (Tr. 471.) Her speech was fluent and clear, and her expressive and receptive language was adequate. (*Id.*) In addition, her mood was euthymic; she was oriented to time, place, and person; she was able to count, perform simple calculations, and complete serial 3s without error; and had good insight and judgment. (Tr. 471–72.) Madera's remote and recent memory were mildly impaired, and she had difficulty managing stressors and completing tasks. (T. 472.) However, Dr. Massey opined that Madera would be able to perform simple tasks and follow and understand simple instructions, that she would be able to maintain attention and concentration, and that she would be able to maintain a

regular schedule.  He opined that Madera would have a mild impairment in learning new tasks and performing complex tasks, although he stated that she might experience greater difficulties when feeling overwhelmed.  (Tr. 472–73.)

Dr. Massey diagnosed Madera with persistent depressive disorder, unspecified anxiety disorder, and a panic disorder.  (Tr. 473.)  However, he opined that these psychiatric problems were not significant enough to interfere with her ability to function on a daily basis.  (*Id.*)  While he conceded that she would be mildly to moderately limited in relating adequately with others, and moderately impaired in appropriately dealing with stress, (Tr. 473), he noted that she could perform a wide range of activities of daily living.  (Tr. 472.)

At the second consultative examination, Madera met with Lyudmila Trimba, M.D., an internist.  (Tr. 476-480.)  Madera's chief complaints were "fibromyalgia, migraine headaches, [and] sleep apnea."  (Tr. 476.)  Madera reported to Dr. Trimba that she had been diagnosed with fibromylagia in 2010 and that she experienced achy burning pain in her whole body, which she rated as level 6 to 7 out of 10 without medication and 3 to 4 out of 10 with medication.  (*Id.*)  She further stated that on a good day she could walk for up to 30 minutes, but that she could not move at all when she had pain.  (*Id.*)  Madera stated that she had suffered from migraine headaches for 15 years, and that the headaches had worsened in the last five years.  Madera reported having migraines daily, and claimed that the medication sometimes did not help, forcing her to lie down.  (*Id.*)  In addition, Madera stated that she had been diagnosed with sleep apnea two years earlier.  (*Id.*)  Although she used a CPAP machine at times, she still felt fatigued.  (*Id.*)

Dr. Trimba noted that Madera reported that she cooked and cleaned when she was able, but that she could not do so when she was fatigued.  (Tr. 477.)  In addition, Madera told Dr. Trimba that she shopped once or twice a month and took care of her children with support.  (*Id.*)

On examination, Dr. Trimba noted that Madera had a normal gait and could get on and off the exam table without help.  (Tr. 478.)  Dr. Trimba noted that Madera had mild tenderness in the cervical spine muscles, trapezius muscles, and supraspinatus muscles, bilaterally.  (Tr. 479.)  Dr. Trimba noted tenderness at the lateral epicondyles and tenderness to palpation in the knees at the medial fat pad proximal to the joint lines.  (*Id*.)

Dr. Trimba diagnosed Madera as having fibromyalgia, migraine headaches, and sleep apnea.  (*Id*.)  She opined that Madera would have "mild limitations" in sitting, standing, and walking for a prolonged period of time, as well as mild limitations in climbing steps, pushing, pulling, and carrying heavy objects.  (*Id*.)  In addition, she opined that Madera should be restricted from driving or being at unprotected heights due to her sleep apnea.  (*Id*.)

The State Examiner's Determination

On October 15, 2014, S. Choi, a non-medical expert single decision maker denied Madera's claim.  (Tr. 83–84.)  Choi found that the medical records did not show any conditions of the nature that would prevent her from working.  (Tr. 92.)  Indeed, Choi opined that Madera's conditions would not prevent her from performing her previous work as a "team assistant."  (*Id.*)

Post-determination Medical Records

In mid-December 2014, three of Madera's treating physicians completed questionnaires attesting to her inability to work a 40-hour week.  On December 11, 2014, Dr. Dolgovina completed a "physical capacity questionnaire" on Madera's behalf.  She noted that she had been treating Madera July 2010, and had diagnosed her with "fibromyalgia, anxiety, cervical radiculopathy, migraine headaches, insomnia."  (Tr. 502.)  The doctor checked a box indicating that Madera would not be able to work a 40-hour workweek and that her impairments were

expected to prevent her from doing so for at least 12 months.  (*Id.*)  When asked to describe the objective and clinical findings that supported her opinions, the doctor wrote:

> The patient is in constant pain and has trigger point tenderness.  As a result[,] she is always fatigued and anxious which also attributes [*sic*] to the severity of her migraine headaches.  All this interferes with her ability to function in a work setting even on [a] part time basis.

(*Id.*)

Madera's psychiatrist, Dr. Isakov, also completed a questionnaire on December 11, 2014. Dr. Isakov wrote that he had been treating Madera since July 29, 2006, and had diagnosed her with "generalized anxiety disorder and posttraumatic stress disorder." (Tr. 501.)  Like Dr. Silverman, Dr. Isakov checked boxes to indicate that Madera could not work a 40-hour workweek and that her impairments were expected to last for at least 12 months.  (*Id.*)  He opined that she could perform simple repetitive tasks, but only "with difficulty." (*Id.*)  When prompted to describe the objective and clinical findings that supported his opinions, the doctor wrote: "[Patient] has long history of generalized anxiety disorder and has [history of] post-traumatic stress disorder.  She is currently under multiple stressors and her symptoms of anxiety worsened." (*Id.*)

On December 15, 2014, Dr. Silverman completed a "physical capacity questionnaire" identical to the one completed by Dr. Dolgovina.  (Tr. 503.)  Dr. Silverman noted that she had seen Madera since December 2010, then checked boxes to indicate Madera could not work a 40-hour week and that this limitation would last at least 12 months.  (*Id.*)  In response to a request that she describe the supporting clinical findings, she handwrote: "see office notes." (*Id.*)

On October 31, 2015, Dr. Isakov wrote another, more comprehensive mental evaluation. His assessment was based in part on two recent individual counseling/psychotherapy sessions

with Madera.  At the first, which took place on October 6, 2015, Madera reported being under significant stress and feeling overwhelmed.  (Tr. 558.)  The doctor observed that Madera was in acute distress, anxious, irritable, with "hopeless" and "obsessive negative thoughts."  (*Id.*)  On examination, she exhibited "attentional and concentration problems," below average cognition, and only fair judgment and insight.  (*Id.*)  Dr. Isakov assessed her as having moderate generalized anxiety disorder related to stress and a Global Assessment of Functioning ("GAF") score of 50.  (*Id.*)[5]

At the second session, which occurred hours before Dr. Isakov prepared his report, Madera presented with reports of stress, anxiety, and difficulty concentrating.  (Tr. 557.)  She noted that that her medication was not relieving her symptoms.  (*Id.*)  The doctor's findings were otherwise identical to those he had made three weeks earlier.  (*Id.*)

According to Dr. Isakov's October 31, 2015, evaluation, Madera suffered from depressive disorders with anhedonia, sleep disturbance, psychomotor retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating.  (Tr. 549.)  Madera also suffered from an anxiety disorder with motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning, persistent irrational fear, recurrent severe panic attacks, and recurrent and intrusive recollections of a past traumatic experience.  (Tr. 550.)  Dr. Isakov opined that Madera had marked restrictions in activities of daily living; moderate difficulty in maintaining social functioning; marked deficiencies of concentration, persistence and pace; and three episodes of decompensation of extended duration.  (Tr. 551.)  Dr. Isakov believed that even a minimal increase in mental demands would be expected to cause an episode of decompensation.  (Tr. 552.)  While Dr. Isakov thought Madera would not be significantly limited

---

[5] GAF scores measure how much a person's psychological symptoms impact their daily life.  Persons with a score of 41–50 have serious symptoms or a serious impairment in social, occupational, or school functioning.

in asking simple questions, maintaining socially appropriate behavior, or being aware of hazards, (Tr. 555–56), he opined that Madera would have a moderate limitation in remembering locations and procedures, understanding and remembering simple instructions, carrying out simple instructions, performing activities within a schedule and maintaining attendance, sustaining ordinary routines, making simple decisions, accepting instructions and responding appropriately to supervisors, getting along with co-workers, responding appropriately to changes in the work setting, traveling to unfamiliar places, and setting realistic goals. (Tr. 554–56.) Dr. Isakov further opined that Madera would have marked limitations in understanding and remembering detailed instructions, sustaining attention for extended periods, working with others without being distracted, and completing a normal workday or workweek without interruptions from psychological symptoms. (Tr 554–55.)

The Veterans Administration Doctors

Dr. Isakov was not the only psychiatrist Madera was seeing in 2015. She was also seeing Felicisima M. David-Quinones, a Veterans Administration psychiatrist, for help in caring for her disabled husband, a former Marine with a traumatic brain injury ("TBI"). It appears that Dr. David-Quinones began seeing Madera on July 28, 2015. (Tr. 536–40.) The doctor's treatment notes for that date indicate that Madera had quit her job and was assisting her husband, who had symptomatic PTSD and TBI and was verbally abusive. (Tr. 537.) Dr. David-Quinones noted that Madera was seeing an outside psychiatrist for anxiety, depression, and fibromyalgia. (*Id.*) Dr. David-Quinones noted normal findings on mental status examinations. (Tr. 538–39.)

Dr. David-Quinones referred Madera to group therapy. Notes from an August 10, 2015, group therapy session indicate that Madera stated she was struggling with motivation, self-care, safety concerns, and asking for help. (Tr. 536.) At an August 25, 2015, session with Madera,

Dr. David-Quinones noted that she was "distressed" over her husband's abusive behaviors.  (Tr. 535.)

Madera saw another Veterans Administration doctor in addition to Dr. David-Quinones: an internist named Renee Venzen, M.D.  It is unclear how often Madera visited Dr. Venzen since the administrative transcript only contains notes of a visit on July 16, 2015, and lab results relating to specimens obtained during an April 2015 visit.  (Tr. 542–48.)  However, Dr. Venzen completed a questionnaire on January 6, 2016, in which she opined that Madera could not engage in substantial gainful activity on a sustained basis at any exertional level for eight hours per day, 40 hours per week for 50 weeks per year.  (Tr. 601.)  Prompted to provide a brief rationale for her answer, the doctor explained: "Madera suffers from frequent fibromyalgia flares, making it difficult to work 40 hours."  (*Id.*)

The ALJ Hearing

Madera received a hearing before ALJ Michelle Allen on December 2, 2016.  Madera testified that she lived with her husband and two children; a 20-year-old daughter and an 8-year-old son.  (Tr. 44.)  She stated that her husband drove her to the hearing and that she drove a car once a week on average.  (*Id.*)  She stated that she takes public transportation and that she has a college degree in business administration.  (Tr. 45.)  Madera stated that she collects a stipend from the Veterans Administration to act as a "caregiver" for her husband.  (Tr. 45–46.)  Her husband has no physical impairments, so this job takes only 2 to 3 hours a day and consists largely of reminding him of medications and accompanying him to doctor's appointments.  (Tr. 46–47.)

Madera testified that she last worked in 2014 and that she left her job when she was no longer allowed an accommodation to come in at 10:00 a.m.  She explained that she suffered

increased pain and stiffness in the mornings, which made it impossible for her to make it to work on time.  Moreover, the job was physically demanding; she was responsible for setting up the boardroom for meetings, which necessitated carrying items weighing 20 pounds.  (Tr. 50–51.) Madera testified that she was unable to do so and would break down items and make multiple trips.  (Tr. 51.)

Madera testified that she had trigger point tests performed by Dr. Silverman.  (Tr. 54–55.) Madera stated that she stopped treating with Dr. Silverman because her insurance changed.  (Tr. 55.)  Madera stated that she treated with Dr. Dolgovina, Dr. Isakov, and Dr. Lachan – a doctor for whom no records appear in the administrative transcript.  (Tr. 56.)

Madera testified that pain and stiffness she experiences in the morning lasts for about three to four hours.  (Tr. 57.)  During that period, she has stiffness in her back, shoulders and arms, making it difficult for her to use her arms, comb her hair, and use her fingers.  (Tr. 57–58.) She stated that she consulted with Dr. Neystat, but that tests were negative for carpal tunnel. (*Id.*)  Madera stated that the pain in her hands gets "pretty bad," and prompted her to cut her hair because she could no longer care for it.  (Tr. 58–59.)

She stated that she cooks twice a week and either has leftovers or orders out the other five days.  (Tr. 59.)  Madera stated that she does not do laundry and that her family helps with household chores.  (Tr. 60.)  She testified that she has tiredness and weakness with fibromyalgic flare-ups, which she experiences two or three times a week.  (*Id.*)

Madera further testified that she has muscle weakness and, at times, headaches.  (Tr. 61.) She stated that she has trouble focusing, staying on track, and concentrating.  (*Id.*)  However, she could use a computer to read articles, watched movies once a week, and went to the movies once a month.  (Tr. 62–63.)  Madera testified that on days when she has flare-ups, she remains on the

sofa and her family leaves her alone.  (Tr. 63.)  Madera testified that if she could return to her job

she would, but that she was physically not able to do so.  (Tr. 64–65.)

Vocational Expert Andrew Pasternak also testified at Madera's hearing.  He testified that

Madera's past relevant work was as an executive secretary: a skilled, sedentary job with an SVP

of 6.  (Tr. 69.)[6]  He stated that it was performed at the light level of exertion.  (*Id.*)  He testified

that Madera's caregiver position was as a therapy aide:  a semi-skilled job, with an SVP of 4,

which required medium exertion.  (Tr. 70.)  Mr. Pasternak testified that a person of Madera's

age, education, and experience, with the residual functional capacity dictated by ALJ Allen

would not be able to do Madera's past work.  (Tr. 71–72.)  However, he testified that such a

person could work as a small product assembler; a machine tender; or a cafeteria attendant.  (Tr.

72–73.)  Mr. Pasternak conceded that if the person was off task 15 percent of the time, there

would be no work available, and that if the person was absent more than two days a month, the

person could not maintain employment.  (Tr. 74.)

ALJ Allen's Decision

On May 11, 2017, ALJ Allen issued her written decision, finding Madera not

disabled within the meaning of the SSA.  (Tr. 23–38.)  In her decision, the ALJ followed the

familiar five-step process for making disability determinations:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> Commissioner next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental
> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the Commissioner will consider him [per se]
> disabled.... Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's

---

[6] SVP stands for Specific Vocational Preparation and reflects the level of training needed for that job.

> severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform
> his past work, the Commissioner then determines whether there is
> other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d

1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920(a)(4).

At step one, ALJ Allen found that Madera had not engaged in substantial gainful

activity since the onset of her alleged disability on July 22, 2014. (Tr. 16.) At step two, the ALJ

found that Madera was severely impaired by the following ailments: "fibromyalgia/chronic pain

syndrome, migraines, mood disorder, cervical radiculopathy, sleep disorder." (*Id.*) At

step three, after considering Listings 1.04 and 12.04, the ALJ found that Madera's impairments

did not meet or qualify as the medical equivalent of any of the listed impairments in Appendix 1

of the regulations. (Tr. 17.)

In analysis germane to steps four and five, ALJ Allen assessed Madera's residual

functional capacity ("RFC"). She determined that Madera had the RFC to perform light work,

except that she would be limited with respect to frequent reaching overhead and in all other

directions and in handling, fingering and feeling. (Tr. 18.) In addition, Madera could only

occasionally ascend stairs and ramps and could only occasionally stoop and crouch. (*Id.*) She

could never work at unprotected heights or kneel, crawl, or climb ladders or scaffolds. (*Id.*)

However, she could occasionally be exposed to humidity, wetness, heat or cold; could perform

simple, routine tasks which required only occasional decision-making; could tolerate occasional

changes in the workplace; and could interact frequently with supervisors, co-workers, and the

public. (*Id.*)

In making this determination, the ALJ gave only "partial weight" to the opinions of Drs.

Dolgovina and Isakov, stating that they were "internally inconsistent and not supported by the

evidence in the record or the activities of daily living." (Tr. 25.) She gave "some weight" to the opinions of Drs. Santos and Venzen. (*Id.*) She acknowledged that Dr. Santos had "a long treating relationship" with Madera, but claimed the doctor's opinion was "vague" because it failed to address Madera's limitations. (*Id.*) The ALJ conceded that Dr. Venzen was "a treating source," but faulted her opinion for failing to provide an explanation of why fibromyalgia flare-ups would prevent the claimant from working 40 hours per week. The ALJ failed to even mention Dr. Silverman's opinions. In contrast, the ALJ gave "great weight" to the opinions of the consultative examiners, Drs. Lyudmila and Massey, noting their familiarity with the Social Security Disability program and their ability to conduct a complete examination. (Tr. 24–25.)

At step four, the ALJ found that, given Madera's RFC, she was unable to perform any past relevant work. (Tr. 26.) However, at step five, the ALJ found that there existed a significant number of jobs in the national economy that Madera could perform. (Tr. 27.) Accordingly, the ALJ found that Madera was not disabled within the meaning of the SSA from July 22, 2014, through the date of the hearing. (*Id.*)

On October 26, 2017, the Appeals Council denied Madera's request for review, rendering the ALJ's decision the final determination of the Commissioner. (Tr. 1–6.) This action ensued. Madera and the Commissioner now move for judgment on the pleadings.

## STANDARD OF REVIEW

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether the claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, a court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chafer*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).

"'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where the Commissioner makes a legal error, a court "cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted). Accordingly, an ALJ's failure to apply the correct legal standards is grounds for reversal. *See id.* (citation omitted).

## DISCUSSION

In her motion for judgment on the pleadings, Madera claims the ALJ failed to properly weigh the medical opinion evidence. The Court agrees. Under the treating physician rule, an ALJ is bound to give "controlling weight" to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)" where that opinion is "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *accord Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134. At the time of the ALJ's decision, a "treating source" was defined as a claimant's "physician, psychologist or other acceptable medical source" who provides, or has provided, the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. §§ 404.1502, 416.902 (2016).

When controlling weight is not given to a treating physician's opinion, the ALJ must give "good reasons" for whatever weight she assigns. *Halloran,* 362 F.3d at 32. In doing so, she is bound to consider the following factors: (1) the length of the treatment relationship and the

frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's opinion; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *see also Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134. Where the ALJ does not appear to have taken into consideration these factors, the Court cannot find that the ALJ has given good reasons. *See, e.g.*, *Sanchez v. Colvin*, No. 13-CV-929 (MKB), 2014 WL 4065091, at *12 (E.D.N.Y. Aug. 14, 2014). In such circumstances, remand is appropriate. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Failure to provide such good reasons for [declining to credit] the opinion of a claimant's treating physician is a ground for remand."); *Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

The Second Circuit has also held that "ALJs should not rely heavily on the findings of consultative physicians ...." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013). "[W]ith regard to non-examining physicians' opinions: The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability." *Ridge v. Berryhill*, 294 F. Supp. 3d 33, 61 (E.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990)); *accord* 20 C.F.R. §§ 404.1527(c)(l), 416.927(c)(l) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). Nevertheless, non-examining consultative

opinions "may constitute substantial evidence if the administrative record supports them." *Byrne v. Berryhill*, 284 F. Supp. 3d 250, 259–60 (E.D.N.Y. 2018) (citing, *inter alia, Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) (summary order)); *see also Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations ... permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record.").

A. The ALJ Ignored the Opinion and Medical Records of Dr. Silverman in Their Entirety

Here, ALJ Allen first erred by failing to address the medical opinion and medical records of Dr. Silverman. While the ALJ's opinion includes a fleeting reference to the fact that Madera testified that she treated with Dr. Silverman and received trigger point injections from her, it does not acknowledge that Madera treated with Dr. Silverman over a period of more than five years. To be sure, Dr. Silverman's handwritten notes can prove difficult to decipher, but they provide a great deal of information when one takes the time to read them. First, the notes clearly indicate that the doctor's examination consistently found that Madera had multiple positive trigger points, as well as muscle spasms and muscle twitching. (Tr. 345, 347, 348, 351, 354, 357.) At the hearing, the ALJ specifically asked Madera if anyone ever performed trigger point tests and Madera indicated that Dr. Silverman had done so. (Tr. 54–55.) This is particularly of note because the ALJ's decision inexplicably appears to question the diagnosis of fibromyalgia which was made by every examining source including the consultative examiner, alleging "there is no credible tender point analysis to support the diagnosis." (Tr. 25.)

It is clear error that the ALJ ignored the opinion and a very lengthy treatment record of this qualified, board-certified specialist in rheumatology within the relevant period and the twelve months prior to the date of onset. There were detailed and relevant findings over a period of five years which were never considered. Additionally, ALJ Allen did not in any way

acknowledge the opinion of Dr. Silverman that Madera could not sustain work on a full-time basis. Thus, the ALJ's opinion cannot possibly be found to have been made on the basis of the record as a whole.

Moreover, ALJ Allen compounded this error by substituting her own non-expert analysis in place of the analysis of multiple qualified experts. The ALJ, who is not a doctor or medical expert, merely asserted that each and every examining medical source was in error when they said that Madera suffered from fibromyalgia.

B. The ALJ Erred in Giving Partial Weight to Drs. Isakov and Dolgovina

Drs. Isakov and Dolgovina were the two main sources of treatment for Madera. Each was a specialist in their field and each treated Madera over a very lengthy period. Like Dr. Silverman, each opined that Madera would not be able to sustain work for a full 40-hour workweek without an episode of decompensation. Dr. Dolgovina, a highly trained neuro-psychiatrist, had treated Madera since 2010. Similarly, Dr. Isakov had treated Madera on and off since 2006. In holding that each of these treating physician's opinions were entitled to only "partial weight," the ALJ used the same cursory, boilerplate statement that the opinions were "internally inconsistent and not supported by the evidence in the record or the activities of daily living." (Tr. 25.)

These are not good reasons. They are wholly deficient, focusing on only one of the several factors (consistency with the record) which the regulations require ALJs to consider in these circumstances. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6); 416.927(c)(2)–(6). The ALJ did not discuss, for example, the nature or extent of the doctors' relationship with Madera, or the fact that each doctor is a specialist in their field. *See Sanchez*, 2014 WL 4065091, at *12. Additionally, ALJ Allen's claim that the doctor's opinions are somehow "inconsistent" with the

doctor's other treatment records is too vague and unspecified to be a good reason.  *See, e.g.*,

*Randall v. Berryhill*, No. 17-CV-1354 (MPS), 2018 WL 4204438, at *7 (D. Conn. Sept. 4, 2018)

(concluding that "unspecified 'inconsistencies'" between a treating source's opinion and his own

records are not good reasons for discounting that opinion).  The ALJ does not give one single

specific reason for discrediting the opinions of either Dr. Isakov or Dr. Dolgovina.

In sum, the ALJ failed to give "good reasons" for discounting the opinions of Madera's

two most prominent treating physicians, and in doing so, violated the treating physician rule.

*See Halloran*, 362 F.3d at 32.

## CONCLUSION

For the reasons set forth herein, the Commissioner's motion for judgment on the

pleadings (Doc. No. 17) is denied.  Madera's motion for judgment on the pleadings (Doc. No.

15) is granted to the extent it seeks remand, and the matter is remanded to the Commissioner of

Social Security for further proceedings consistent with this Order.  The Clerk of Court is

respectfully directed to enter judgment in accordance with this Memorandum and Order and to

close this case.

SO ORDERED.

Dated: Brooklyn, New York
       March 25, 2020                        *Roslynn R. Mauskopf*
                                    _____
                                    ROSLYNN R. MAUSKOPF
                                    Chief United States District Judge